### Terrill WEISS, Plaintiff,

v.

### NORTHWEST BROADCASTING INC., Defendant.

### No. C.A. 99–811 GMS.

United States District Court,
D. Delaware.

April 18, 2001.

---

Michael Louis Vild, The Bayard Firm, Wilmington, DE, for plaintiffs.

Regina A. Iorii, Richard Douglas Heins, Ashby & Geddes, Wilmington, DE, Joseph P. Hornyak, Sonnenschein Nath & Rosenthal, Washington, DC, for defendant.

## MEMORANDUM AND ORDER

SLEET, District Judge.

In November of 1999, Terrill Weiss ("Weiss") filed this action alleging that Northwest Broadcasting, Inc. ("North-

west") promised and agreed to finance a bid for a Federal Communications Commission ("FCC") construction permit to build a television station in Houston, Mississippi. Weiss seeks to recover damages for breach of contract, or in the alternative, for losses incurred because of his reasonable reliance upon Northwest's alleged promises. Northwest timely answered and asserted a counterclaim for breach of contract. Presently before the court is Northwest's motion for summary judgment wherein it contends that Weiss cannot establish a claim for breach of contract. Because there are no genuine issues of material fact in dispute that prevent the court from ruling that Weiss' claims fail as a matter of law, the court will grant Northwest's motion for summary judgment. The follow sections set forth the basis for this decision in greater detail.

## I. STANDARD OF REVIEW

Summary judgment is appropriate only if the record shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See also 2–J Corp. v. Tice*, 126 F.3d 539, 540 (3d Cir. 1997). The moving party bears the burden of proving that there are no genuine issues of material fact in dispute. *See Carter v. Exxon Co.*, 177 F.3d 197, 202 (3d Cir.1999); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir.1996). In deciding a motion for summary judgment, all inferences should be drawn in the light most favorable to the non-moving party. *See Carter v. Exxon Co.*, 177 F.3d at 202. In determining if summary judgment is appropriate, the court's "function is not to weigh the evidence and determine the truth of the matter," but to determine whether there are genuine issues of material fact in dispute. *Id.* (citation omitted). "Facts that could alter the outcome are 'material', and disputes are 'genuine' if evidence exists from

which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms*, 90 F.3d at 743 (citation omitted).

■ In particular, in a breach of contract action, the court can grant summary judgment only when "the contract is unambiguous and the moving party is entitled to judgment as a matter of law." *Newport Assocs. Development Co. v. Traveler's Indemnity Co.*, 162 F.3d 789, 791 (3d Cir.1998) (citing *Tamarind Resort Assocs. v. Government of Virgin Islands*, 138 F.3d 107, 111 (3d Cir.1998)).

With these standards in mind, the court will turn to the facts that led to this lawsuit.

## II. FACTS

This lawsuit arose in connection with a series of agreements made between the parties for procuring a permit to construct a television station. Because the parties dispute whether valid contracts were formed, and if they were, if those contracts were breached, the court will provide a detailed description of the parties' discussions.

### A. Auction for the Channel 45 Permit

Terrill Weiss is the managing member and 30% owner of Trace Broadcasting LLC ("Trace"). Trace is a limited liability company organized under the laws of Mississippi. Trace was formed in 1995 for the purpose of exploring business opportunities in the broadcasting industry, and in particular, it was formed for the purpose of bidding on the application for a construction permit for Channel 45 in Houston, Mississippi. The defendant, Northwest, is a corporation organized under the laws of Delaware with its principle place of business in Michigan. Northwest is in the

business of owning and operating televisions stations in various markets throughout the United States.

Some time in January of 1998, Trace along with several other companies, applied to the FCC for a permit to construct Channel 45 in Houston, Mississippi. On January 26, 1998, Weiss, on behalf of Trace, signed an Auction and Settlement Agreement ("Auction Agreement"). This Auction Agreement provided that the applicants would participate in a telephone auction on January 30, 1998. The highest bidder would receive the permit for Channel 45. In order to be eligible to participate in the auction, an applicant had to submit a $25,000 deposit by January 27, 1998. Under the terms of the Auction Agreement, the applicant that submitted the highest bid at the auction was required to tender the full amount of its bid within ten business days after the auction. The amount tendered by the winning applicant, less certain fees and expenses, would then be distributed pro rata to the remaining applicants in return for the dismissal of their applications for the Channel 45 construction permit. If the high bidder failed to tender its full bid amount within ten days, its application for the Channel 45 permit would be dismissed and it would forfeit both its $25,000 security deposit and its right to share in the distribution of the high bid.

The Auction Agreement also contained an anti-white knight provision. Specifically, it stated that "[j]oint bidding ventures, partnerships, consortia, combinations, alliances and any other agreements, arrangements or understandings of any kind relating to any aspect of the auction ... shall be prohibited."

Around the same time that Trace began to pursue the Channel 45 permit, Weiss solicited financial partners to finance procuring the permit and building the station on behalf of Trace. Weiss approached a media broker, Bruce Fox ("Fox"), regarding the Channel 45 application. According to the plaintiffs, Fox suggested that Brian Brady ("Brady"), President of Northwest, might be interested in the Channel 45 opportunity.

## B. The Parties' Discussions and the Loan Documents

On or about January 22, 1998, Weiss and Brady first discussed the status of the permit application process and the upcoming auction for the FCC permit. As a result of this conversation, Brady, on behalf of Northwest, sent a letter to Trace, in care of Fox, on January 27, 1998 ("the January 27th letter"). The January 27 letter set forth the terms of the agreement that Fox and Brady had negotiated with regard to "Northwest Broadcasting being the white knight for [Weiss]." Northwest agreed to "bid or cause [Trace] to bid up to One Million Dollars" for the Channel 45 permit. The January 27th letter also agreed, that if Northwest was the successful bidder, it would pay all applicants their pro rata share according to the Auction Agreement. Trace would receive its pro rata share plus $150,000. If Northwest was unsuccessful, it would have no obligation to Trace. Finally, the January 27th letter stated that: "[t]his letter will serve as our agreement and if everything is satisfactory with you I will have my attorney draw up formal agreements."

Also on January 27, 1998, Weiss wired $25,000 as a non-refundable deposit to the escrow agent pursuant to the Auction Agreement in order to take part in the auction for the Channel 45 permit.

On January 29, 1998, Weiss faxed a copy of the Auction Agreement to Northwest. Northwest claims that upon reviewing the Auction Agreement, it realized that the Auction Agreement contained an anti-white knight provision. Therefore, North-

west probably would not be able to "bid or cause Trace to bid" for the Channel 45 permit as the January 27th letter provided. Northwest alleges that it discussed the problems of the anti-white knight provisions with Weiss. Weiss states that it was possible that there was some discussion regarding this provision.

Although it is not clear as to the nature of Brady's and Weiss' discussions concerning the anti-white knight provision of the Auction Agreement, Northwest sent another letter to Weiss care of Fox on January 30, 1998, the morning of the auction ("the January 30th letter"). The January 30th letter was intended to supersede the January 27 letter.[1] The January 30th letter provided instead that Northwest would loan to Weiss, "individually, the sum of One Million Dollars to be used by you to bid on the construction permit." Northwest also agreed to indemnify Weiss in the event it failed to perform. In the January 30th letter Northwest explicitly stated that it understands that if the "funds are not transferred to [Weiss], it will cause a default if [Weiss] were the highest bidder, and that default will result in a dismissal of [his] application." The January 30th letter also stated that: "[a]s security for this loan, you agree to pledge the assets of Trace Broadcasting, LLC to Northwest. Further it is understood that you will personally guarantee this loan." Finally, Northwest explained to Weiss that if everything in the letter was satisfactory, its attorney would then draw up the formal agreements.

The auction for the Channel 45 permit took place on January 30, 1998. Trace submitted a bid of $1,085,000, which was the highest bid. Weiss contends that Brady maintained contact with him during the telephone auction and specifically authorized Weiss to continue bidding. Under the Auction Agreement, Trace was required to tender the full amount of its bid (less its $25,000 deposit) by February 13, 1998.

On February 10, 1998, Northwest's attorneys sent the following documents to Weiss and his counsel (the "February 10th loan documents").[2]

1. Financing Agreement between Northwest Broadcasting, L.P. and Trace;

2. Note from Trace to Northwest Broadcasting, L.P.;

3. Security Agreement between Northwest and Trace;

4. Personal guarantee by Weiss;

5. Pledge Agreement between each member of Trace and Northwest; and

6. Local Marketing Agreement for Channel 45 between Northwest and Trace.

Five of these documents required only Weiss' signature. The Pledge Agreement, however, contemplated a pledge of all of the stock in Trace as security for the loan and, therefore, required the signatures of all members of Trace. After Northwest sent Weiss the loan documents, the parties dispute the reasons for the transaction's failure.

## C. The Parties' Contentions

Weiss claims that the February 10th loan documents substantially differed from earlier agreements discussed between the

---

**1.** The parties appear to dispute whether the January 30th letter superceded the January 27th letter or if it further clarified its terms. There is some evidence that the January 30th letter replaced the January 27th letter. For example, in his deposition, Weiss does appear to concede that the January 30th letter in fact superceded the earlier letter, however, Weiss' arguments imply that he considers the January 27th letter to still be valid.

**2.** Weiss maintains that he did not receive these documents until February 11, 1998.

parties, and altered the nature of the lending relationship as clarified in Brady's January 30th letter. First, Weiss claims that the Financing Agreement purports to be between Trace and Northwest, however, the January 30th letter was between Weiss and Northwest. Second, Weiss claims that the Financing Agreement required that each member of Trace pledge their membership interests as security for the loan, whereas, the January 30th letter only required Weiss to pledge the assets of Trace. Weiss asserts that as managing partner, he had the power to pledge Trace's assets without the consent of the other members.

After receiving the February 10th loan documents, Weiss maintains that "[l]ogistics were difficult for signing and delivering papers." That is, Weiss claims that he only had essentially one business day to review and accept the new loan documents. Still, Weiss claims that he "did everything that he could to satisfy the new conditions Northwest now demanded before funding the loan." Notwithstanding Weiss' efforts, the other two members of Trace would not agree to pledge their shares as security for a loan to Trace. Weiss maintains that he asked Brady to waive this requirement, but to no avail. Weiss faxed copies of the signature pages with his own signature at 11:00 pm, on the 12th of February. Weiss did not obtain signatures of the other two Trace members.

Weiss argues that the February 10th loan documents are not valid for two reasons. First, he claims that the documents were not validly executed because he never received signed copies back from Northwest. Alternatively, Weiss contends that even if the February 10th loan documents were executed, his failure to get the signatures of Trace's other two members invalidated the loan documents by its own terms. In support of this argument, Weiss points to the terms of the Financing Agreement which state that the obligation of the lender "to enter into this agreement" is subject to delivery of, among other things, the executed pledges from the other two Trace members. Therefore, Weiss argues that because the February 11th loan documents are not valid, the January 27th or January 30th letters are valid contracts.

In contrast, Northwest argues that the January 27th and January 30th letters contemplate that the parties would enter into formal agreements regarding the transaction, but do not constitute valid contracts. Northwest also maintains that these letters are insufficient on their face to form an enforceable contract. Finally, Northwest maintains that the January 27th and January 30th letters did not constitute valid contracts because the Financing Agreement contained a merger clause.[3] Thus, according to Northwest, the only valid agreement is the Financing Agreement sent with the other loan documents on February 10th.

According to Northwest, the parties then negotiated and signed the Financing Agreement and several other loan documents. Northwest maintains that Weiss needed to obtain the signatures of the other members of Trace in order to satisfy a condition precedent in the Financing Agreement. Under the terms of the Financing Agreement, a condition precedent is defined as: "[t]he obligation of Lender [Northwest] to enter into this Agreement and to engage in the transactions contemplated hereby shall be subject to delivery by Borrower [Trace] to Lender of each of the following ..."

---

**3.** The merger clause provides that: "[t]his Agreement supersedes any prior agreements between the parties contemplated hereunder and contains all of the terms agreed upon with respect to such arrangements."

A membership interest pledge agreement duly executed by each of the members. of [Borrower] [Trace] ("the members") in the form attached hereto as Exhibit C ("Pledge Agreement").

Northwest argues that because Weiss failed to secure the signatures of the other members of Trace on the Pledge Agreement, it did not fund the loan.

Northwest alleges that Weiss never objected to any of the documents after receiving them. Instead, they claim that Weiss called Northwest's counsel and suggested changes to certain documents. Northwest then alleges that their attorneys incorporated these changes proposed by Weiss and others and sent these change pages to Weiss on February 12, 1998. The February 12th letter also enclosed new signature pages for the six documents, and concluded by asking that the signature pages be faxed back that night.

Northwest alleges that Weiss signed each of the six documents on behalf of Trace. Late on the evening of February 12th, Weiss faxed five of the six pages back to Northwest's attorneys. He did not return the signature page for the Pledge Agreement, the only document of the six that required the signatures of all three members of Trace.

## III. DISCUSSION

The parties' central dispute concerns the legal effect of the February 10th loan documents and, in particular, the Financing Agreement. Before the court can determine if the Financing Agreement is a valid contract, however, it must first determine which state's laws apply in this matter.

### A. Choice of Law

A federal district court sitting in diversity must apply the choice of law rules of the state in which it sits to determine which state's law governs the controversy before it. *Hionis Int'l Enterprises,*

*Inc. v. Tandy Corp.,* 867 F.Supp. 268, 271 (D.Del.1994) (citing *Day & Zimmermann, Inc. v. Challoner,* 423 U.S. 3, 4, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *Klaxon Co. v. Stentor Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). Therefore, the court will apply Delaware's choice of law rules. Delaware courts apply the modern "most significant relationship" test of the Restatement (Second) of Conflicts § 188 to resolve conflicts issues arising out of the interpretation and validity of contracts. *See Travelers Indem. Co. v. Lake,* 594 A.2d 38, 41 (Del.1991). "Delaware choice of law rules also rely on Restatement (Second) of Conflicts of Law § 187 for the proposition that 'the parties' choice of law, as expressed in their agreement, will be upheld unless the state whose law would control in the absence of a choice has a materially greater interest in the subject matter.'" *Hionis Int'l,* 867 F.Supp. at 271 (quoting *Rosenmiller v. Bordes,* 607 A.2d 465, 468 (Del.Ch.1991)). Under Delaware law, express choice of law provisions in contracts are generally given effect. *Id.* The Financing Agreement states that it is governed by Delaware law. The court finds no reason to disturb the parties' choice. Therefore, the court will apply Delaware's substantive law to the contract claims in this case.

### B. Validity of the Financing Agreement

After reviewing the parties submissions, there appear to be no genuine issues of material fact in dispute that would prevent this court from ruling as a matter of law. Rather, the parties dispute the legal significance of the events surrounding the execution of the February 10th loan documents. The parties do not dispute the following facts which are relevant to determining if the February 10th documents constitute a valid contract: 1) Weiss signed five of the six February 10th loan

documents and transmitted those documents to Northwest's counsel on February 12th, 2) Weiss failed to obtain the signatures of the other two Trace members on the Pledge Agreement, 3) The Financing Agreement contained a condition that required Weiss to obtain those signatures, 4) The Financing Agreement contained a merger clause, and 5) Weiss' attorneys did request some changes in the February 10th documents, but there was no objection raised as to the Pledge Agreement, or the involvement of Trace.

Although Weiss does not dispute the events described above, he still maintains that the February 10th loan documents are invalid. Weiss offers several reasons in support of this contention. First, he claims that the Financing Agreement was between Trace and Northwest rather than between himself and Northwest. Second, Weiss claims that his failure to obtain the signatures of other Trace members nullified the Financing Agreement by its own terms. Third, he argues that Northwest abandoned the Financing Agreement because it never returned an executed copy of the documents to him. The court will address these arguments in turn.

█ First, the court finds Weiss' argument that the February 10th loan documents are invalid because they were between Trace and Northwest rather than Weiss and Northwest to be unavailing. In Weiss' Second Amended Complaint, he clearly admits that "Mr. Weiss acted as the agent for Trace in making the agreement . . . ." Moreover, as is evident from the January 27th and 30th letters, the parties contemplated agreements between Northwest and Weiss individually and between Northwest and Trace. Also, as is clear from the record, neither Weiss nor his attorney objected to the documents on this basis. The fact that he negotiated

other changes regarding the documents, but did not raise this issue, demonstrates that he had an opportunity to object to the documents if the contracts involved the wrong parties. Finally, despite claiming that the February 10th loan documents involved the wrong parties, Weiss willingly acted on behalf of Trace when he executed the documents and sent them back to Northwest's counsel. Hence, Weiss actions demonstrate that the loan contemplated by the February 10th loan documents is the same loan contemplated by the January 27th and January 30th letters. In light of these uncontested facts in the record, the court finds Weiss' argument to be unpersuasive.

█ Second, Weiss argues that his failure to fulfill the Financing Agreement's condition precedent prevented the contract from becoming effective. In other words, Weiss argues that the condition precedent contained in the Financing Agreement, is a condition to the contract's formation and not its performance. In light of the clear terms of the Financing Agreement, the court also finds this argument to be without merit. As a general matter, a condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises. *Cf. Gilbert v. El Paso Co.*, 575 A.2d 1131, 1142 (Del.1990). *See also Restatement (Second) of Contracts § 224* (defining a condition as "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due").[4] Most conditions precedent describe acts or events which must occur before a party is obliged to perform, however, this situation must be distinguished conceptually from a condition precedent to the formation or

---

**4.** The Restatement § 224 refers to conditions precedent simply as conditions in order to eliminate the confusion surrounding conditions precedent and subsequent. *Id.*

existence of the contract itself. *See Oppenheimer & Co. v. Oppenheim, Appel, Dixon, & Co.*, 86 N.Y.2d 685, 636 N.Y.S.2d 734, 660 N.E.2d 415, 418 (1995).

In this case, the express terms of the Financing Agreement reads as follows: *Conditions Precedent:* The obligation of Lender [Northwest] to enter into this Agreement and to engage in the transactions contemplated hereby shall be subject to delivery by Borrower [Trace] to Lender of each of the following, each dated as of the date hereof" . . .

7. A membership interest pledge agreement duly executed by each of the members of Borrower [Trace] ("the Members") in the form attached hereto as Exhibit C ("Pledge Agreement").

To support his position, Weiss has seized upon the language of the Financing Agreement which states that Northwest's obligation "to enter into this Agreement" is contingent upon the stated conditions precedent. When read in its entirety, however, it is clear that the clause provides that Northwest's obligation "to engage in the transaction contemplated," that is, *to perform the contract,* is contingent upon the stated conditions precedent. Under Delaware law, the provisions of a contract must be read as a whole and the words chosen, if they are neither expressly defined nor words of art, should be given their plain and normal meaning. *See E.I. du Pont de Nemours v. Shell Oil Co.*, 498 A.2d 1108, 1113–1114 (Del.1985). Therefore, considering the clear language of the contract provision as a whole, the court finds that the Financing Agreement contained a condition precedent to performance and not a condition to formation of the contract.

Finally, the court rejects Weiss' argument that the contract is invalid because he did not receive a signed copy back from Northwest after he executed and delivered five out of the six February 10th loan documents. In his brief opposing the motion for summary judgment, Weiss concedes that "Northwest Broadcasting, L.P.'s president [Brady] apparently signed the Contract . . . . ." D.I. 40, at 11. Thus, it is undisputed that both parties to the agreement signed the documents. Weiss, however, argues that because Northwest did not return a signed copy to him, the contract is invalid. When parties intend for a contract to be effective upon execution, the absence of actual physical delivery will not invalidate a contract. *See Hutchinson v. Fish Engin. Corp.*, 203 A.2d 53, 59 (Del.Ch.1964). Weiss does not assert, nor is there any evidence in the record, that he did not intend to receive the funds needed to acquire Channel 45 permit upon signing the Financing Agreement and the other February 10th loan documents. Because Weiss signed the documents and returned them to Northwest's counsel, the court cannot ignore overt conduct which establishes his intent to be bound by the contract. *Cf. Acierno v. Worthy Brothers Pipeline Corp.*, 693 A.2d 1066, 1070 (Del.1997).

After considering the undisputed facts on the record, the court finds that the February 10th loan documents, and in particular the Financing Agreement, constitutes a valid contract. Furthermore, because the Financing Agreement states by its express terms that it supercedes any prior agreements, the court will not determine whether the January 27th and January 30th loan documents were valid contracts.

## C. Promissory Estoppel

Weiss also argues that Northwest is liable to him under a theory of promissory estoppel. Because the court has determined that the Financing Agreement is a valid contract, Weiss cannot recover under a theory of promissory estoppel. "The

doctrine of promissory estoppel is an equitable remedy 'designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement.'" *Feinberg v. Saunders, Karp & Megrue, L.P.*, No. 97–207–SLR, 1998 WL 863284, at *17 (D.Del. Nov.13, 1998) (citations omitted). In other words, promissory estoppel is generally viewed as a consideration substitute for promises which are reasonably relied upon, but which would otherwise not be enforceable. *See Lord v. Souder*, 748 A.2d 393, 400 (Del.2000). Hence, a party cannot assert a promissory estoppel claim based on promises that contradict the terms of a valid, enforceable contract. *Feinberg*, 1998 WL 863284, at *17. *Cf. Genencor Int'l Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 12 (Del.2000) (observing "that a promissory estoppel analysis is not applicable to cases in which the alleged promise is supported by consideration"). Because both parties assented to the Financing Agreement, the court finds that Weiss is not entitled to damages under a promissory estoppel theory.

### D. Northwest's Counterclaim

On November 28, 2000, Northwest filed an Answer to Weiss' Second Amended Complaint. D.I. 34. In this Answer, Northwest also raised a counterclaim for breach of contract. Specifically, Northwest alleges that "under the Financing Agreement and related documents, Northwest agreed to loan $1 million to Trace upon satisfaction of certain conditions precedent. Among other things, Trace agreed that Northwest would receive a Local Marketing Agreement giving Northwest the right to operate Channel 45 in Houston, Mississippi." Northwest claims

that Trace's failure to deliver a Pledge Agreement constitutes a breach of contract. Because of this breach, Northwest claims that it is entitled to damages for the lost revenue from the operation of Channel 45 by Northwest, pursuant to the Local Marketing Agreement.[5]

After considering the language of the Financing Agreement, the court will also dismiss Northwest's counterclaim for breach of contract. The Financing Agreement is a contract in which Northwest, as the lender, agrees to loan money to Trace for the construction of Channel 45. The Financing Agreement expressly states that as a condition precedent to performance, Weiss had to obtain his partners' signatures on the Pledge Agreement. The Financing Agreement also expressly states that as a condition precedent to performance, Weiss needed to obtain a duly executed Local Marketing Agreement. These requirements are clearly described in terms of conditions and not in terms of promises. *See Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 94 A.D.2d 947, 948, 463 N.Y.S.2d 960 (N.Y. 1983) (holding that a party was not entitled to damages when an agreement clearly designated a provision as a condition precedent and not a promise to perform). This is a key distinction.

The assertion that the nonperformance of a condition precedent constitutes a breach of the agreement is incorrect. *See* 3A Corbin on Contracts § 634, at 33. *See also Saulcy Land Co. v. Jones*, 983 P.2d, 1200, 1204 n. 2 (Wyo.1999); *Frost Constr. Co. v. Lobo, Inc.*, 951 P.2d 390, 397 (Wyo.1998) ("A condition precedent should not be described as broken."). Rather, a

---

5. Under Rule 7(a) of the Federal Rules of Civil Procedure, Weiss was required to reply to Northwest's counterclaim. Fed.R.Civ.P. 7(a) ("There shall be a complaint and an answer; a reply to a counterclaim denominated as such"). A review of the docket, however, reveals that Weiss has failed to file a reply or answer to Northwest's counterclaim.

condition merely does not exist or does not occur. *See* 3A Corbin on Contracts, § 634.

The non-fulfillment of a promise is called a breach of contract, and creates in the other party a secondary right to damages; it is the failure to perform that which was required by a legal duty. The non-occurrence of a condition will prevent the existence of a duty in the other party; but it may not create any remedial rights and duties at all, and it will not unless someone has promised that it shall occur.

*Merritt Hill Vineyards,* 94 A.D.2d at 948, 463 N.Y.S.2d 960 (citing 3A Corbin, Contracts, § 633). *See also* 5 Williston on Contracts [3d ed.] § 665 (stating that breach of promise subjects the promisor to liability in damages, while non-occurrence of a condition prevents a party from acquiring a right or deprives him of one, but does not subject him to liability). In this case, Weiss' failure to obtain signatures on the Pledge Agreement excused Northwest's obligation to lend the funds, it did not however, create any remedial rights and remedies that would entitle Northwest to damages. Therefore, in light of the clear language of the Financing Agreement, the court finds that Northwest is not entitled to damages flowing from Weiss' failure to deliver the Local Marketing Agreement.

## IV. CONCLUSION

For the foregoing reasons, the court concludes that the Financing Agreement constitutes a valid contract and that Weiss failed to comply with a condition precedent in that contract. The court also concludes that Northwest is not entitled to damages for Weiss' failure to satisfy a condition precedent to the Financing Agreement. Therefore, the court grants Northwest's motion for summary judgment and holds that Weiss' claims for breach of contract and damages under a promissory estoppel theory fail as a matter of law.

For these reasons, IT IS HEREBY ORDERED that,

1. Northwest's Motion for Summary Judgment (D.I.36) is GRANTED.

2. Summary Judgment be and hereby is ENTERED in favor of Northwest and against Weiss on all claims in the complaint.

3. Northwest's Counterclaim (D.I.34) for breach of contract is DISMISSED with prejudice.