**In re U.S. WEST, INC. SECURITIES LITIGATION**

**No. 00–188–RRM.**

United States District Court,
D. Delaware.

May 2, 2002.

Norman M. Monhait, Carmella P. Keener, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, Robert A. Wallner, U. Seth Ottensoser, Milberg Weiss Bershad Hynes & Lerach LLP, New York, New York, Joseph H. Weiss, Mark D. Smilow, Weiss & Yourman, New York, New York, for plaintiffs.

Anne C. Foster, Richards, Layton & Finger, Wilmington, Delaware, Rory O. Millson, Sandra C. Goldstein, Cravath, Swaine & Moore, New York, New York, for defendants.

## MEMORANDUM OPINION

McKELVIE, District Judge.

These are securities class actions arising out the merger of U.S. West, Inc. and Qwest Communications International Inc. Plaintiffs are two classes of shareholders of U.S. West. The defendants are Qwest and its Chief Executive Officer and Chairman, Joseph P. Naccio. Defendant Qwest is a Delaware corporation that provides telecommunications services. Its principal place of business is in Denver, Colorado.

Plaintiffs claim that the defendants made false and misleading statements in a September 17, 1999 Proxy Statement that detailed the terms of the U.S. West—Qwest Merger Agreement and solicited shareholder approval. The Merger Agreement included a "no solicitation" provision

limiting the defendants' freedom to entertain third-party bids for Qwest. According to the plaintiffs, the Proxy Statement was false and misleading because it failed to disclose that Qwest and its representatives, including Nacchio, intended to breach the "no solicitation" provision before the merger closed. To support this assertion, plaintiffs cite news reports appearing on March 1, 2000 that Qwest was negotiating a merger with Deutsche Telekom AG, despite Qwest's earlier agreement to merge with U.S. West. Plaintiffs allege that the share price of U.S. West plummeted on the news of the Qwest—Deutsche Telekom negotiations.

The first class of plaintiffs is comprised of shareholders solicited by the Proxy Statement to vote on the proposed merger and who held their shares on March 1, 2000. This class seeks relief pursuant to Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a). The second class of plaintiffs, comprised of shareholders who held their shares on March 1, 2000, assert that the Proxy Statement was a promise to shareholders that the defendants would not breach the Merger Agreement. The second class seeks to recover for that promise on a theory of promissory estoppel.

On January 2, 2002, the defendants moved to dismiss the plaintiffs' Consolidated Amended Complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The primary question presented by the defendants' motion is whether a Proxy Statement that discloses the terms of a merger agreement and solicits its approval can be false and misleading if one of the parties, at the time of the Proxy Statement, intended to breach that agreement at a later point.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following facts, which are assumed to be true for purposes of this motion to dismiss, are taken from the plaintiffs' complaint and the Proxy Statement discussed therein.

On July 18, 1999, U.S. West and Qwest announced a proposed Merger Agreement in which U.S. West shareholders would receive Qwest shares valued at $69 for each share of U.S. West. The share price was conditioned upon Qwest's average trading price remaining between $28.26 and $39.90 during a period preceding the closing of the merger. The two companies issued a joint Proxy Statement to their shareholders on September 17, 1999. The Proxy Statement summarized the terms of the merger and attached the Merger Agreement. The shareholders of both companies approved the merger on November 2, 1999.

Page I–40 of the Proxy Statement contained the following disclosure summarizing the "no solicitation" covenant of the Merger Agreement.

NO SOLICITATION. U S WEST and Qwest have agreed that they and their subsidiaries and their officers, directors, employees and advisers will not take action to solicit or encourage an offer for an alternative acquisition transaction involving U S West or Qwest of a nature defined in the merger agreement.

Restricted actions include engaging in any discussions with or furnishing any information to a potential bidder, or knowingly taking any other action designed to facilitate an alternative transaction. Qwest or U S WEST, as the case may be, is permitted to take these actions in response to an unsolicited offer, however, if the unsolicited offer is made prior to the time that the U S

WEST or Qwest shareholder approval, as the case may be, is obtained and .... Consolidated Am. Compl. at ¶ 19. This provision was based upon Section 5.03 of the Merger Agreement, which detailed the limitations on solicitation of, and negotiation with, third parties.

On March 1, 2000, the Bloomberg news service reported that Qwest and Deutsche Telekom were in merger talks. Following that report, Qwest's shares rose $12¹³⁄₁₆ to a closing price of $59⁹⁄₁₆ a share, while U.S. West's shares dropped 8% in price to close at $72 a share. On March 3, 2000, The Denver Post reported that Nacchio made statements explaining how Qwest could break off its merger with U.S. West. According to the report, Nacchio said "[e]very merger can be intervened on; it only costs money." He also allegedly stated "this [merger] is not like at any costs. At the end of the day, I have an obligation to Qwest shareholders to make this deal really worthwhile .... I want the merger to go through, but I'm not going to get blackmailed to do dumb business things to make it go through." On March 8, 2000, Deutsche Telekom announced it had ended negotiations with Qwest. Following the termination of those negotiations, the Wall Street Journal and The Denver Post reported statements by persons opining that Qwest's talks with Deutsche Telekom breached the Merger Agreement with U.S. West.

Plaintiffs filed their first action against Nacchio and Qwest, entitled *Mizzaro v. Nacchio*, 00–188–RRM, on March 17, 2000. Plaintiffs filed a second action, *Brody v. Nacchio*, 00–198–RRM, on March 20, 2000. The plaintiffs allege that "had [U.S. West shareholders] known of Nacchio's intent not to abide by and not to be bound by the terms of the Merger Agreement, they would not have voted to approve the Merger." Plaintiffs also allege that they would have "required that the merger consideration be substantially more favorable for U.S. West shareholders than set forth in the Merger Agreement."

In June of 2000, the merger of U.S. West and Qwest closed. With the consent of the parties, the court ordered the two actions consolidated and appointed lead plaintiffs and lead counsel on September 14, 2001. The defendants brought this motion to dismiss on January 2, 2002. This is the court's decision on the defendants' motion.

## II. DISCUSSION

### A. Legal Standard on Motions to Dismiss

In evaluating the defendants' motion to dismiss the plaintiffs' Consolidated Amended Complaint, the court must "accept as true the allegations in the complaint and its attachments, as well as reasonable inferences construed in the light most favorable to the plaintiffs." *U.S. Express Lines, Ltd. v. Higgins,* 281 F.3d 383, 388 (3d Cir.2002). In considering the Consolidated Amended Complaint, the court need not, however, accept unwarranted inferences and legal conclusions set forth in the Complaint. *Doug Grant, Inc. v. Greate Bay Casino Corp.,* 232 F.3d 173, 183–84 (3d Cir.2000). "In appraising the sufficiency of the complaint [the court] follow[s], of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Although generally limited to the Complaint and inferences reasonably drawn therefrom, the court may also consider documents integral to the pleadings with-

out converting the motion into one for summary judgment under Rule 56. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997).

B. *Does the Pleading Standard of the PSLRA Apply to Plaintiffs' Claims Under § 14(a) of the Securities Exchange Act?*

In support of their motion to dismiss, the defendants argue that plaintiffs' complaint fails to allege facts demonstrating an actionable omission in the challenged proxy statement. The defendants charge that the relevant standard for measuring the adequacy of the plaintiffs' complaint is § 21D(b)(1) of the Exchange Act, as modified by the PSLRA, 15 U.S.C. § 78u–4(b)(1), which states:

(1) Misleading statements and omissions In any private action arising under this chapter in which the plaintiff alleges that the defendant -

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

*Id.* It is uncontested that the plaintiffs' complaint alleges the defendants made an untrue statement of material fact or omitted to state a material fact necessary to make other statements not misleading. Plaintiffs argue, however, that the PSLRA's heightened pleading standard is inapplicable to claims seeking relief based on § 14(a) of the Securities Exchange Act

because claims under that provision may be proven under a standard of negligence. *See Herskowitz v. Nutri/System, Inc.,* 857 F.2d 179, 189–90 (3d Cir.1988) (only negligence is required to make out a claim under § 14(a)); *Gould v. American–Hawaiian S.S. Co.,* 535 F.2d 761, 777 (3d Cir.1976) (same).

Plaintiffs' argument confuses § 21D(b)(1) of the Exchange Act, which applies generally to private suits, and § 21D(b)(2) of that Act, which applies to claims requiring proof of a particular state of mind. It is clear from the defendants' brief that they seek only to apply the standard in § 21D(b)(1) of the Exchange Act, 15 U.S.C. § 78u–4(b)(1). That section undoubtedly applies to the plaintiffs' claims because they allege a "private action arising under this chapter" that alleges an untrue statement of material fact or a material omission necessary to make other statements not misleading. *See Charal Inv. Co. v. Rockefeller,* 131 F.Supp.2d 593, 602 (D.Del.2001) (applying subsection (b)(1) to claims under both § 10(b) and § 14(a) of the Exchange Act); *In re: NAHC, Inc. Sec. Litig.,* No. Civ. A. 00–4020, 2001 WL 1241007, *21 (E.D.Pa. Oct.17, 2001) (applying subsection (b)(1) to § 14(a) claims); *Giarraputo v. UNUM–Provident Corp.,* No. Civ. 99–301, 2000 WL 1701294 (D.Me. Nov.8, 2000) (same).

The plaintiffs' argument that the PSLRA's heightened pleading requirements do not apply to their claims under § 14(a) of the Securities Exchange Act is directed to the immediately successive provision of the PSLRA, § 21D(b)(2), which states:

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular

state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2). This court has previously expressed doubt that the provisions of subsection (b)(2) apply to complaints alleging only claims under § 14(a) of the Securities Exchange Act because such claims require only the allegation of negligence, and not scienter. *See In re Reliance Sec. Litig.*, 91 F.Supp.2d 706, 729 (D.Del.2000) ("While the PSLRA, 15 U.S.C. § 78u–4(b)(2), might be interpreted as raising the pleading requirements for alleging violations of Rule 14a–9, the court will await direction from the Third Circuit before contravening express precedent on this issue."); *but see In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1267 (N.D.Cal.2000) (disagreeing with *Reliance* on the basis that no Ninth Circuit precedent establishes that negligence is not a "state of mind" for purposes of subsection (b)(2)). The circumstances of this case do not require the court to revisit its holding in *Reliance,* however, because it is evident that the defendants rely only on subsection (b)(1) in challenging the plaintiffs' complaint. Because the court finds (b)(1) to apply to plaintiffs' claims, the court will apply that standard. *See Charal,* 131 F.Supp.2d at 602 (applying (b)(1) in a § 14(a) action).

C. *Have the Plaintiffs Satisfied Their Burden in Pleading a Violation of the Exchange Act?*

■ Defendants argue that the plaintiffs have failed to specify "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). The plaintiffs, in response, argue that they have shown statements contained in the

Proxy Statement to be misleading, including the provision of the Merger Agreement in which the parties promised not to engage in merger discussions with a third party following shareholder approval of the transaction. According to the plaintiffs, those statements are misleading because Qwest and Nacchio never intended to be bound by that provision, as evidenced by the Deutsche Telekom talks and Nacchio's statements in the press about his view of the Merger Agreement's "no solicitation" provision. The plaintiffs contend that although the statements alleged to be misleading were made in a September 1999 Proxy Statement and the Deutsche Telekom transaction did not occur until March 2000, they are entitled to a fair inference that, at the time of the Proxy Statement, Qwest and Nacchio intended to breach the Merger Agreement.

The defendants argue that because the Proxy Statement adequately discloses the terms of the Merger Agreement, and because no party disputes what the terms of the Merger Agreement are, the Proxy Statement could not have been misleading because it merely describes the parties' agreement. The defendants' argument is supported by the statements on which the plaintiffs rely in their Consolidated Amended Complaint. The only statements cited by the plaintiffs in their complaint are the actual "no solicitation" provision of the Merger Agreement and the Proxy's Statement's summary of that provision. *See* Consolidated Am. Compl. at ¶ 19, 20. There is nothing misleading about attaching a copy of the Merger Agreement itself, because it is what the parties agreed. The Proxy Statement's summary of the Merger Agreement's "no solicitation" provision goes no farther afield. The summary simply states that "U S WEST and Qwest have agreed that they and their subsidiaries and their officers, directors, employees

and advisers will not take action to solicit or encourage an offer for an alternative for an alternative acquisition transaction involving U S WEST or Qwest of a nature defined in the merger agreement." Consolidated Am. Compl. ¶ 19. The plaintiffs' Consolidated Amended Complaint contains no allegation that this statement is a misleading portrayal of what was agreed by the parties in the Merger Agreement.

The plaintiffs' theory of the case is that the representation that Qwest and U.S. West agreed to a "no solicitation" provision is misleading if, at the time of the Proxy Statement, the defendants intended to breach that provision. Merely reciting and describing the terms of a previously entered Merger Agreement is not misleading simply because one party may intend to breach the provisions of that agreement in the future. Assuming that Nacchio did have the expectation, at the time of the Proxy Statement, that he would later breach the Merger Agreement (as the court must on a motion to dismiss), that fact makes nothing misleading about a Proxy Statement that merely recounts and describes the terms earlier agreed upon by the parties.

The plaintiffs assume that the inclusion of the "no solicitation" provision and summary in the Proxy Statement creates a fair inference that "after shareholder approval of the Merger was obtained, Qwest and its representations would not enter into discussions for an alternative merger transaction with any other party," as alleged in paragraph 3 of the complaint. However, the Proxy Statement's recitation of the "no solicitation" provision is merely a representation that, on the date the parties entered the Merger Agreement, the parties agreed to be so bound. The provisions of the Proxy Statement on which plaintiffs rely contain no statement about the future intentions of the parties. Thus, the defendants' future compliance with the Merger Agreement cannot be fairly inferred from the Proxy Statement. Moreover, the plaintiffs have not shown that the defendants had a duty to disclose any future intentions.

Section 21D(b)(1) of the Exchange Act, 15 U.S.C. § 78u–4(b)(1), requires plaintiffs to identify each statement in the Proxy Statement they believe to be misleading and the reasons why the statement is misleading. Plaintiffs have not satisfied § 21D(b)(1) because they have not explained why the statements they identified (that is, the summary and recitation of the Merger Agreement) inaccurately or misleadingly describe the Merger Agreement. Therefore, the court will grant plaintiffs' motion to dismiss as to the Exchange Act claim.

### D. Have the Plaintiffs' Adequately Pled Their Claim of Promissory Estoppel?

The plaintiffs claim that the Proxy Statement's recitation of the "no solicitation" provision constituted a promise to the U.S. West shareholders that the defendants would not breach that obligation. The plaintiffs claim they relied on that promise in voting for the merger and were harmed as a result when U.S. West's share price dropped on the news of the negotiations between Deutsche Telekom and Qwest.

The defendants present two arguments as to why the court should dismiss the plaintiffs' promissory estoppel claim. First, the defendants contend that there can be no promissory estoppel claim because there is an actual enforceable contract at issue, namely the Merger Agreement between Qwest and U.S. West, and promissory estoppel is inapplicable where there is an enforceable contract. *See Lord v. Souder*, 748 A.2d 393, 400 (Del.2000)

("Promissory estoppel is more accurately viewed as a consideration substitute for promises which are reasonably relied upon, but which would otherwise not be enforceable."); *Weiss v. Northwest Broadcasting Inc.*, 140 F.Supp.2d 336, 345 (D.Del.2001) ("a party cannot assert a promissory estoppel claim based on promises that contradict the terms of a valid, enforceable contract"); *see also Carlson v. Arnot–Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir.1990) (noting that, under Pennsylvania law, promissory estoppel "is invoked in situations where the formal requirements of contract formation have not been satisfied and where justice would be served by enforcing a promise"). Second, the defendants argue the plaintiffs have failed to allege facts that, if true, would fulfill all the elements of promissory estoppel, including any detriment caused to them.

In response, the plaintiffs charge that the defendants have misstated their promissory estoppel claim. They assert their promissory estoppel claim is not based on the mutual covenants contained in the Merger Agreement, but in a separate promise made by the defendants to U.S. West shareholders in the Proxy Statement that Qwest would comply with the "no solicitation" provision. As to the defendants' second argument, the plaintiffs claim that the facts alleged in their Exchange Act claim, including their reliance on the defendants' statement and the damages stemming therefrom, are incorporated by reference in their promissory estoppel claim.

Before addressing these arguments, the court notes that the plaintiffs have not alleged a breach of contract claim based on the Merger Agreement. Section 10.06 of the Merger Agreement states that the shareholders have no rights or remedies under the agreement until after the merg-

er closes. Thus, the plaintiff shareholders cannot be third party beneficiaries of the Merger Agreement until its closing, which was several months after the Proxy Statement, the shareholder approval, and the negotiations with Deutsche Telekom.

Instead of relying on the Merger Agreement, the plaintiffs rely on the Proxy Statement and identify two of its provisions in its complaint. In paragraph 20, plaintiffs cite the actual "no solicitation" provision of the Merger Agreement, appended to the Proxy Statement. To the extent that the plaintiffs rely on the covenants of that agreement, the defendants are correct that there can be no liability for promissory estoppel on this basis. First, the shareholders are not party to the Merger Agreement and are not third party beneficiaries under it. Second, promissory estoppel has no application where an express agreement is enforceable between the parties. As the Seventh Circuit has explained,

> Promissory estoppel is meant for cases in which a promise, not being supported by consideration, would be unenforceable under conventional principles of contract law. When there is an express contract governing the relationship out of which the promise emerged, and no issue of consideration, there is no gap in the remedial system for promissory estoppel to fill.

*All–Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 869 (7th Cir.1999). Because the Merger Agreement is an enforceable contract between its parties, there can be no reasonable reliance by shareholders on the promises contained in that agreement, and thus there is no occasion for the application of promissory estoppel.

The complaint details only one other provision of the Proxy Statement. As previously noted, paragraph 19 of the Proxy Statement states that the parties agreed to

a "no solicitation" provision and summarizes that covenant of the Merger Agreement. As noted previously, however, a summary of the terms of a prior agreement is not a *representation* that the parties intend to comply with that agreement in the future. For purposes of promissory estoppel then, neither is the summary of terms of a prior agreement a *promise* that the parties intend to further comply with that agreement. The plaintiffs have not cited, anywhere within the complaint, a promise made by the defendants in the Proxy Statement that they intended to comply with the covenants contained in that agreement, including the "no solicitation" provision.[1] Yet it is exactly this promise that plaintiffs contend induced their reliance.

Therefore, the court concludes that the plaintiffs have failed to state a claim that defendants made a promise to comply with the terms of the Merger Agreement. The court will therefore grant the defendants' motion to dismiss as to the promissory estoppel claim.

### III. CONCLUSION

For the foregoing reasons, the court will grant the defendants' motion for summary judgment. The plaintiffs seek relief because they believe the Proxy Statement contains a representation (for purposes of the § 14(a) of the Exchange Act) or promise (for purposes of promissory estoppel) that the defendants will comply with all the terms of the Merger Agreement. This alleged representation or promise is based solely on the Proxy Statement's recitation and summary of the provisions of the Merger Agreement alleged to have been breached. Because the court concludes that the mere recitation and summary of the Merger Agreement constitutes neither a representation nor promise that the parties will comply with its provisions, the court will grant the defendants' motion to dismiss because the plaintiffs have not set forth facts upon which they might prevail if proved.

---

1. Even if the court assumed that the Proxy Statement fairly inferred that the defendants would comply with the Merger Agreement, that supposed "promise" would arise only by implication, and thus would be too indefinite to induce the reasonable reliance of the plaintiff shareholders. It is well-established that "implied" statements cannot form the basis of promissory estoppel because of their inherent uncertainty. *See C & K Petroleum Prods., Inc. v. Equibank,* 839 F.2d 188, 192 (3d Cir.1988) (refusing to apply promissory estoppel based on "broad and vague implied promise"); *Continental Ins. Co. v. Rutledge & Co.,* 750 A.2d 1219, 1234 (Del.Ch.2000) (noting that promissory estoppel will only be applied where the promise relied upon is "definite and certain").